UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LAUREN STROBLE,<br><br>Plaintiff,<br>v.<br><br>WALMART,<br><br>Defendant. | CASE NO. 3:21-cv-05627-DGE<br><br>ORDER GRANTING DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT LEVI DIXON (DKT. NO. 58), GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 56) |

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 56) and Defendant's motion to exclude Plaintiff's expert Levi Dixon (Dkt. No. 58). For the reasons discussed herein, the Court GRANTS both motions.

## I BACKGROUND

On May 9, 2019, Plaintiff was injured trying on a pair of capri pants in a Walmart dressing room. A Walmart employee unlocked a dressing room and permitted Plaintiff to try on her pants in the dressing room. (Dkt. No. 57 at 6.)[1]

The flooring in the dressing room appears to be a vinyl-type flooring, but the record lacks information about the specific type of the flooring. (Dkt. No. 67 at 16.) There was no visible damage or "slipperiness" to the flooring when Plaintiff entered the dressing room. (Dkt. No. 57 at 6, 8–9.) Nor was there anything on the floor when Plaintiff was in the dressing room. (*Id*. at 6.) Plaintiff removed her shoes and was barefoot in the dressing room. (*Id*.)[2] Plaintiff placed her purse on the bench. (*Id*. at 7.) It also appears Plaintiff shut the door. (*See* Dkt. No. 68-4 at 2.)

Plaintiff then began putting on the pants. No Walmart employee directed her on how to put on the pants. (Dkt. No. 57 at 9.) Plaintiff was standing on the left side of the dressing room with her back against the wall. (*Id*. at 7–8.) As she explains,

---

[1] Photos of the dressing room were provided. (*See id*. at 12–13.) Based on the photos, it appears the dressing room is rectangular in shape. The front wall is a door that opens into the dressing room. When the door is shut, the dressing room is entirely closed. It is not clear what the internal wall of the dressing room looks like when the door is shut; there is presumably a doorknob to open the door, and it appears there may be a hook at the top although it is unclear whether this hook only holds items on the public-facing wall or if there are also hooks on the internal dressing room side. A mirror extends from the left side of the back wall to the back-half of the wall on a customer's left when they enter the dressing room. The front-half of the left wall, while covered by the door when the door is opened, appears otherwise unobstructed. A bench extends from the right-half of the back wall to the back-half of the wall on the customer's left when they enter the dressing room. There is a hook several feet off the ground on the front half of the wall for clothes.

[2] It is unclear whether Plaintiff had been wearing pants when she had arrived in the dressing room that she had removed prior to the incident (and if she had, where they were located) or if she was wearing pants that permitted her to try on another pair of pants over them or a skirt or dress that permitted her to try on pants without removal of any clothing.

> So I was standing on my right—I'm sorry. I was standing on my left leg. I put my left leg in the pants, bracing myself against the wall and on my left leg. I lifted my right leg, put the foot through the pant hole. Was putting my foot down, and that's when I slipped and the fabric hit the floor, and I fell. You know the old saying, you put your pants on one leg at a time?

(*Id*. at 8.) She was standing on one leg and putting her full weight on that leg when she fell. (*Id*.) Plaintiff "fell down" and "ended up on [her] behind." (*Id*.) Her "legs were towards the wall" with the hook (i.e., the right wall) and her body was positioned in "an L-shape." (*Id*.) She fell "so fast that [she] was already on the floor before [she] realized what happened" and did not have time to break the fall with her hands. (*Id*.)

A witness, Marnie Vanderpool, described the scene as follows based on her position sitting on a stool in the fitting room:

> [I] saw the customer standing up putting on capri pants, she put one leg through the pants [but] did not pull [the] pants on all the way; she had her right foot still one[sic] of the pants leg, and her foot slid on the floor, and hit the door and screamed 'ow' and she stated that she broke her leg.

(Dkt. No. 68-3 at 2.)[3]

Several staff members came to Plaintiff's assistance. (Dkt. Nos. 57 at 9; 68-3, 68-4, 68-5.) Plaintiff told Walmart employees it was her fault she fell when she was awaiting assistance. (*Id*.) She does not remember telling them that she lost her balance. (*Id*.) Paramedics then took Plaintiff to the hospital. (Dkt. No. 68-4 at 2.)[4]

## II LEGAL STANDARD

### A. Motion to Exclude

---

[3] It is unclear how Ms. Vanderpool saw the accident if the door was shut.

[4] Plaintiff does not provide a copy of her medical records, but it appears undisputed that Plaintiff broke her leg and required surgery. (Dkt. No. 67 at 2.)

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"[B]efore admitting expert testimony [under Rule 702], the district court must perform a gatekeeping role to ensure that the [proffered] testimony is both relevant and reliable." *United States v. Valencia-Lopez*, 971 F.3d 891, 897–898 (9th Cir. 2020) (citation modified). Generally, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry" and "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (internal citation omitted). The Ninth Circuit has cautioned district courts from weighing expert "conclusions or assum[ing] a factfinding role." *Elosu v. Middlefork Ranch, Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022). The Court "is not tasked with deciding whether the expert is right or wrong, just whether [the] testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-*Car, 738 F.3d at 969–970. The party seeking to introduce expert testimony evidence must show by a preponderance of the evidence that the testimony is admissible under Rule 702. *Daubert*, 509 U.S. at 592, n.10.

However, Rule 702 should be applied with a "liberal thrust" favoring admission. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

**B. Motion for Summary Judgment**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—in most civil cases, a preponderance of the evidence. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv. Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts

specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

## III DISCUSSION

### A. Defendant's motion to exclude Dixon's opinions is granted

Plaintiff retained Levi Dixon to opine on the "safety of the flooring used by Walmart in the dressing rooms of the at-issue store." (Dkt. No. 59 at 5.) Dixon has been employed at Applied Cognitive Sciences since 2014. (*Id*. at 16.) He was initially hired as an intern but has since worked for Applied Cognitive Sciences as an Assistant Engineer and Associate Engineer. (*Id*.) He is currently a Senior Engineer with a focus on Human Factors Engineering and Safety and Risk Management. (*Id*.) Dixon has been involved in investigating and analyzing over 1,000 legal cases. (*Id*.) His role includes

> reading and generating summaries of discovery material, accident case file material, and depositions; conducting research in the field of safety and risk management; and conducting accident scene site inspections which involves making relevant field observations, taking measurements and photographs, documenting all relevant information, as well as conducting both on scene and laboratory testing.

(*Id*. at 16.) His areas of expertise include "facility design and fall incidents (falls from elevation and falls at elevation), workplace injuries, warnings and hazard communications, and automative incidents." (*Id*.)

Dixon opines that a "basic principle" relating to "decreasing the risk of pedestrians slipping and falling" is that "walkways should be 'slip resistant' so that they provide safe traction for pedestrians." (*Id*. at 9.) He identifies that "[s]ince the 1950s there have been a number of

publications, textbooks, and the like discussing the basic safety principle that the static coefficient of friction/slip resistance for a horizontal walking surface should be at **least 0.50 or above to** be considered safe for pedestrians[.]" (*Id.*) He identifies a study that found the average coefficient of friction/slip resistance for socks on vinyl or wood flooring is below 0.50. (*Id.* at 10.) He also identifies a study that found terrycloth bathmat on porcelain tile has a friction/slip resistance coefficient below 0.50. (Dkt. No. 64 at 5.) Applying these facts, Dixon then asserts Plaintiff had a textile in the form of the pant leg between her foot and the floor and the floor was a vinyl flooring "known to not provide safe transaction if/when pedestrians are stepping with textiles (socks, pant legs, or the like) underfoot." (Dkt No. 59 at 11.) Accordingly, Dixon made the following five conclusions:

> 1. It is my understanding that the flooring surface is no longer in existence, so it would not be possible for me to measure the coefficient of friction of textile material (like linen) on the flooring system in the dressing room.
> 2. From a Safety perspective, it should be expected that patrons will be standing up when they try on pants in the dressing room.
> 3. When trying on pants in the dressing room, it is predictable that a pedestrian will step onto the floor with fabric between their foot and the flooring surface, including at times when they may already be off balance.
> 4. The interaction of the fabric and vinyl floor surface reduced the coefficient of friction and resulted in [Plaintiff] being exposed to a risk of harm due to slipping.
> 5. From a Safety and Human Factors Engineering perspective, [Plaintiff] was behaving in a foreseeable/predictable manner at the time of her incident.

(*Id.* at 13.) Dixon reviewed photographs, the incident report, witness statements, documents produced by Walmart, and the deposition of Plaintiff to reach his conclusions. (*Id.* at 8.)

Defendant moves to exclude Dixon's report because "his opinions and conclusions lack foundation and/or are not based on reliable methodologies[.]" (Dkt. No. 58 at 1.) Plaintiff opposes the motion and asserts, "[t]he scientific theory, technique, or specialized knowledge upon which Dixon bases his opinion (1) has been or can be tested; (2) has been subjected to peer

review or publication; (3) is subjected to applicable standards; and (4) is generally accepted in the field of expertise. (Dkt. No. 63 at 9.) The motion is fully briefed. (*See* Dkt. Nos. 63, 66.)

**1. Dixon lacks specialized knowledge**

Defendant first argues Dixon's testimony should be excluded because Dixon lacks specialized knowledge. (Dkt. No. 58 at 6.) Defendant asserts Dixon "did not measure available slip resistance under the conditions at issue, did not analyze the traction demands of the specific posture of Plaintiff (i.e., standing on one leg while donning pants), and did not quantify any reduction from the textile at issue (i.e., linen) when interposed on the flooring at issue." (*Id.*) Defendant further asserts the literature Dixon cites to is "all based on traction demands during 'active locomotion'" whereas in this case Plaintiff was "standing still on her left foot and stepping down with her other foot to try pants on." (*Id.* at 6–7.) Finally, Defendant asserts that Dixon "does not provide any literature or basis to support the type of 'expected' human behavior addressed in his report" but instead "merely speculates that there is 'potential' for one's foot to get caught on/in a pant leg, which could result in loss of balance." (*Id.* at 7.) In sum, Defendant argues,

> In the absence of any testing, the literature [Dixon] relies upon is both misleading and inapplicable to the circumstances at issue . . . [H]is opinions reduce to nothing more than general observations—that patrons may stand, may stand on textiles, and that standing on one leg can, as a matter of common sense, affect balance.

(*Id.*)

Plaintiff responds that (1) the industry standard of requiring a 0.50 coefficient of friction for a surface to be deemed safe for pedestrians "should be applied to the Walmart dressing room as patrons must ambulate in and out of the room" (Dkt. No. 63 at 11), (2) Dixon's "research, previous testing, and previous studies" permit him to "competently opine[] that the coefficient of friction in the Walmart dressing room fell well below the industry standard for safety" (*id.*), and

(3) "Dixon's explanation of what actions are to be reasonably expected in a dressing room are based on his safety analysis of user behavior inside of a dressing room and are consistent with everyday experience in dressing rooms" so "[l]iterature and studies are unnecessary to support basic safety analysis of foreseeable and expected behavior in a dressing room" (*id*. at 11–12).

Plaintiff's argument relies on the Court accepting that the 0.50 friction/slip resistance coefficient benchmark for a pedestrian horizontal walking surface is the proper benchmark for flooring in a dressing room because an individual must walk into the dressing room. But Plaintiff, and others who use dressing rooms, are not walking while trying on clothing in a dressing room. Plaintiff concedes trying on pants in a dressing room "require[s] less friction to maintain stability" than the friction needed for walking. (Dkt. No. 63 at 11.) Accordingly, Dixon's citations to the benchmark that a friction/slip resistance coefficient of 0.50 is generally required for pedestrian horizontal walking surfaces is of little value in this matter. Dixon does not identify any safety principle identifying a benchmark for a safe coefficient of friction/slip resistance for flooring surfaces used in a dressing room. Because Plaintiff does not identify any guideline for a safe friction/slip coefficient in the context of dressing oneself in a dressing room beyond implicitly recognizing that a coefficient below 0.50 would be appropriate because less friction is required than for walking, the Court cannot conclude that Dixon has specialized knowledge in this field.

**2. Dixon does not apply reliable methodology to sufficiently reliable facts**

Second, Defendant argues Dixon's testimony should be excluded because it lacks sufficient facts or data, and his methods are unreliable. (Dkt. No. 58 at 7.) Defendant asserts Dixon "took no tribometer measurements of the subject floor or any exemplar to quantify available slip resistance or any effect of the interposed fabric"; "[w]ithout case-specific

coefficient of friction values for the floor, the garment (i.e., linen), or the interaction between the floor and the fabric," Defendant asserts, Dixon's "conclusory opinions that the flooring was 'unsafe' and causation opinions lack foundation." (*Id.*) "In essence," Defendant concludes, "Dixon has merely inferred how the fabric-floor interaction 'created a slippery and unsafe condition' and caused or contributed to the fall—classic conclusory assertions unsupported by testing or validated modeling." (*Id.* at 8.)

Plaintiff responds that the lack of slip resistance testing on the subject flooring is the fault of Defendant because Defendant "replaced the flooring and then failed to produce the specifications of the flooring during discovery[.]" (Dkt. No. 63 at 12.) Plaintiff also responds, "Dixon's opinion is not based on mere speculation but an in-depth review of studies regarding the impact of textiles on various hard smooth floorings and pictures of the at-issue flooring, along with his extensive education, training, and experience as a Safety and Human Factors Engineer." (*Id.*)

Dixon relies on studies evaluating the friction/slip resistance coefficient of terrycloth, cotton, and cotton blend textiles. (*See* Dkt. Nos. 59 at 10, 64 at 4–5.) Dixon does not opine on the friction/slip resistance coefficient of linen or how it would compare to terrycloth, cotton, or cotton blend. Dixon also does not opine on whether the friction/slip resistance coefficient of a pant leg and a sock or bathmat would be different. Instead, rather than providing testimony on how one would identify the friction/slip resistance coefficient in this case (a linen pant on vinyl floor while dressing oneself), Plaintiff argues that the fact Plaintiff fell while doing the comparatively safer activity of dressing oneself, "is evidence of how extremely low the coefficient of friction was with the introduction of textile on the hard flooring surface because

undisputably [Plaintiff]'s foot slipped." (Dkt. No. 63 at 11.) But it does not follow that the coefficient of friction was low simply because Plaintiff fell.

Dixon asserts he could not do an analysis of the friction/slip resistance coefficient in this circumstance because the specific dressing room floor was not available. (Dkt. No. 59 at 8.) However, neither Dixon nor Plaintiff explain why Dixon's analysis is entirely absent of any analysis of a safe friction/slip resistance coefficient for an individual dressing oneself or the expected friction/slip resistance coefficient of an individual like Plaintiff who had linen pants stuck between her and a vinyl floor. As identified by Defendant, "[h]ow would Walmart even begin to argue that Dixon is wrong regarding a coefficient of friction value he has not derived, concerning a floor he has not identified, on premises he has not inspected?" (Dkt. No. 66 at 9.)

Accordingly, because Dixon does not identify (1) a benchmark for a safe friction/slip resistance coefficient for individuals dressing themselves nor (2) the expected friction/slip resistance coefficient for an individual in Plaintiff's situation, the Court cannot conclude Dixon's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Therefore, the Court GRANTS Defendant's motion to exclude Levi Dixon (Dkt. No. 58).

**B. Defendant's motion for summary judgment is granted**

The fundamental question in this matter is whether the floor in the Walmart dressing room where Plaintiff slipped was unreasonably dangerous. "Proof of a dangerous condition remains an element of a premises liability claim." *Johnson v. Liquor and Cannabis Board*, 486 P.3d 125, 134 (Wash. 2021). In slip and fall cases, "[d]etermining whether an unreasonably dangerous condition existed is not automatic." *Id.* This is because "[i]t is well established . . . that something more than a slip and a fall is required to establish . . . the existence

of a dangerous condition." *Brant v. Mkt. Basket Stores, Inc.*, 433 P.2d 863, 865 (1967); *see also Johnson*, 486 P.3d at 134. To survive a motion for summary judgment, Plaintiff must raise at least a genuine question of material fact regarding whether "the dressing room floor was unreasonably dangerous—for example, because it was particularly slippery." (*See* Dkt. No. 41 at 4.) Plaintiff asserts that "Defendant installed laminate/vinyl type flooring" and "[l]aminate and vinyl flooring is particularly slippery." (Dkt. No. 48 at 2.)

Plaintiff asserts there is a genuine question of material fact regarding whether the laminate/vinyl floor "under the foreseeable conditions of dressing room use, with customers wearing socks or having garment fabric between their feet and the surface" constitutes an unreasonably dangerous condition. (Dkt. No. 67 at 12.) Plaintiff bases this assertion on testimony from Levi Dixon that "socks on textured vinyl flooring produce a static [coefficient of friction] of approximately **0.25**—well below the 0.50 threshold required for safe pedestrian use." (*Id*. at 14.) As identified *supra*, this threshold is based on safety involving pedestrian horizontal walking surfaces and not on safety involving an individual dressing themself, despite Plaintiff conceding an individual dressing themself requires less friction to maintain stability. Moreover, the identified coefficient of .25 is from cotton or cotton blend socks of a walking individual and not linen pants worn by an individual in the process of dressing themself. Because the Court could not conclude that (1) the 0.50 friction/slip resistance coefficient threshold applies to individuals dressing themself or (2) the .25 friction/slip resistance coefficient is an accurate measurement of an individual in Plaintiff's situation, the Court granted Defendant's motion to exclude Dixon's testimony. As a result, Plaintiff has not met her burden of raising a material question of fact as to whether the dressing room flooring at issue in this case was unreasonably dangerous.

Accordingly, the Court GRANTS Defendant's motion for summary judgment (Dkt. No. 56).

## IV ORDER

For the reasons identified herein, Defendant's motion to exclude Levi Dixon (Dkt. No. 58) and Defendant's motion for summary judgment (Dkt. No. 56) are GRANTED. The trial calendar is stricken, and the Clerk shall close the case and enter judgment.

Dated this 11th day of August, 2026.



David G. Estudillo
United States District Judge